# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**NORTH AMERICAN MECHANICAL, INC.,**

**Plaintiff,**

**v.**                                        **Case No. 12-CV-598**

**WALSH CONSTRUCTION COMPANY II, LLC,**

**Defendant.**

---

## DECISION AND ORDER

---

I.      **Facts and Procedural History**

When in 2010 Mercy Walworth Hospital and Medical Center in Lake Geneva, Wisconsin wanted to remodel and expand its facility ("the Project"), it hired Walsh Construction Company II, LLC (Walsh) as the general contractor. (Ex. 519.) The Project consisted of renovating the existing hospital and constructing new spaces to expand the size of the hospital and medical center. The construction work was to be phased so that the hospital could remain open during construction. On June 24, 2010, Walsh entered into a Subcontract Agreement with North American Mechanical, Inc. (NAMI) to install the heating, ventilation, and air conditioning (HVAC) systems, including air-handling units, ductwork, boilers, and chillers for the Project. (Tr. 24; Ex. 501). Plumbing work

was subsequently added, and NAMI subcontracted that work to Masterson Plumbing. (Tr. 25-26.) The subcontract amount was $3,996,000. (Ex. 501.)

In preparing its bid, NAMI requested information from Walsh regarding its schedule for the Project. (Tr. 24, 29-30; Ex. 531.) Significant in NAMI's bid was its expectation, based upon the schedule provided by Walsh, that it would begin its work on August 24, 2010, immediately after the exterior framing of the building. (Tr. 31.) The preliminary schedule indicated that interior rough-in work would not begin until approximately a month after NAMI's installation work began. (Tr. 32.) Other segments of the Project indicated the same sort of sequencing. (Tr. 33-34.) NAMI personnel made clear in an email to Walsh its expectations regarding the sequencing of work and the lead time it would be afforded to complete its work before certain other subcontractors commenced their work. (Tr. 36-39; Ex. 15.)

Walsh had no problems with NAMI's expectations regarding the sequencing of work (Tr. 993-94) and the preliminary schedule was subsequently incorporated into the parties' contact as Exhibit K. (Ex. 501.) These scheduling and sequencing expectations were a factor in NAMI's bid. For example, NAMI's bid anticipated that it would be able to prefabricate large sections of ductwork and install them as single units rather than piecemeal (Tr. 47-48) and that it would be working in an enclosed building so that it would not be impacted by the weather (Tr. 50).

The subcontract, however, obligated NAMI to proceed with its work in accordance with Walsh's schedule as amended from time to time. (Ex. 501 at 2.1.) Walsh was empowered to direct the sequence and pace of NAMI's work, "including overtime, without monetary compensation to [NAMI]." (Ex. 501 at 2.1.) In coordinating the Project, Walsh was tasked with allocating site resources, which the contract defined as "site access and access to work areas, utilities, storage space, and all other characteristics of the Project site and the Project work." (Ex. 501 at 5.1.) Provided Walsh acted in good faith in allocating site resources, NAMI waived "any and all claims for damages, extensions of time or for increase to the Subcontract Amount as the result of any delay, disruption, interference, obstruction, hindrance, suspension, acceleration, constructive acceleration, out-of-sequence work, change or other cause arising from [Walsh's] allocation of Site Resources." (Ex. 501 at 5.1.)

NAMI similarly waived any claim against Walsh "for any damages or additional compensation as a consequence of delay, hindrance, interference or other similar event, caused by [Walsh] …." (Ex. 501 at 4.4.) The subcontract provided that NAMI's "sole and exclusive remedy for any delay, hindrance, interference or other similar event, shall be an extension in time for performance of [its] work." (Ex. 501 at 4.4.) If NAMI believed an extension of time or other relief with respect to the terms of the subcontract was necessary, it was required to submit a written claim to Walsh within one week of when NAMI planned to begin the affected work or within one week of NAMI first learning of

3

the event giving rise to the claim, whichever occurred first. (Ex. 501 at 4.3.) If NAMI failed to make a timely claim, it waived the claim. (Ex. 501 at 4.3.) During the time that Walsh was considering any claim, NAMI was required to proceed diligently with its work unless the parties agreed otherwise in writing. (Ex. 501 at 4.3.)

The Project called for certain of the subcontractors, including NAMI, to participate in building information modeling (BIM), a process whereby the initial building plans created by the architect are converted into a virtual three-dimensional computer model and supplemented with details from many of the subcontractors to create a single, comprehensive, digital model of the Project. (Ex. 501 J.) Walsh created the initial BIM based upon the architect's two-dimensional plans, but the BIM did not include everything set forth on the plans. (Tr. 852-53.)

The Project was behind schedule from the outset (Tr. 916-17, 1137) and NAMI quickly encountered conditions very different from those it contemplated in its bid. For example, in areas that NAMI expected to be clear and open so that it could install large sections of prefabricated ductwork, it encountered steel studs and drywall already installed. (Tr. 126, 550-51.) In addition, areas to which it expected to have unfettered access it often found congested with other subcontractors working at the same time. (Tr. 314-15.) As a result, NAMI alleges that during the course of its performance Walsh required it to perform a substantial amount of work outside the scope of the subcontract for which it was not paid. On June 12, 2012 (ECF No. 1), while still working to complete

4

the Project, it filed suit against Walsh, alleging claims for breach of contract and quantum meruit.

The matter was initially assigned to the Honorable Patricia J. Gorence but was reassigned to this court upon Judge Gorence's retirement. All parties consented to the full jurisdiction of a magistrate judge in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). (ECF Nos. 51, 52.) After this court dismissed NAMI's quantum meruit claim but otherwise denied Walsh's motion for summary judgment (ECF No. 54), the matter proceeded to trial. A weeklong trial commenced on May 11, 2015, with the court as the finder of fact. (ECF Nos. 74 – 80.) The parties submitted post-trial briefs (ECF Nos. 82, 84), proposed findings of fact (ECF Nos. 81, 83), and responses (ECF Nos. 85, 86). The matter is now ready for final resolution.

## II.     Jurisdiction, Venue, and Applicable Law

Venue is proper in this district under 18 U.S.C. § 1391(b)(2). Subject matter jurisdiction is based upon the diversity of citizenship of the parties. 28 U.S.C. § 1332(a)(1). For diversity of citizenship to exist, complete diversity is required, meaning that every defendant must be a resident of a state other than that of every plaintiff, *Bankmanagers Corp. v. Fed. Ins. Co.*, 712 F.3d 1163, 1165, (7th Cir. 2013); *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 759 (7th Cir. 2009), and the amount in controversy must exceed $75,000, 28 U.S.C. §1332(a).

The citizenship of a limited liability company (LLC) is determined by the citizenship of each of its members. *IP of a W. 86th St. 1, LLC v. Morgan Stanley Mortg. Capital Holdings, LLC*, 686 F.3d 361, 363 (7th Cir. 2012). To ensure the existence of complete diversity, *Belleville Catering Co. v. Champaign Mkt. Place, LLC*, 350 F.3d 691, 693 (7th Cir. 2003), the court had Walsh identify the citizenship of all of its members (ECF No. 73). Walsh's membership is comprised of two trusts and one LLC. (ECF No. 73, ¶ 2.) "The citizenship of a trust is that of the trustee." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). "Citizenship means domicile (the person's long-term plan for a state of habitation)," *Myrick v. Wellpoint, Inc.*, 764 F.3d 662, 664 (7th Cir. 2014), and the trustee of each trust is domiciled in Illinois (ECF No. 73, ¶ 3). The member LLC is itself comprised of eight members—the same two trusts that are separately members of Walsh Construction Company II, LLC (the defendant here) and six individuals, all of whom are domiciled in Illinois. (ECF No. 73, ¶¶ 5-7.) NAMI is a Delaware corporation whose principle place of business is in Wisconsin, and consequently is a citizen of Wisconsin and Delaware. *See* 28 U.S.C. § 1332(c)(1). Thus, complete diversity exists. The amount in controversy far exceeds $75,000.00 (*see* ECF No. 1 at 10 (alleging that at the time of the complaint, damages were at least $2.8 million)), and therefore diversity jurisdiction exists.

Pursuant to the parties' contract, the present dispute is governed by Wisconsin law. (Ex. 501 at 11.1.) "The elements for a breach of contract in Wisconsin are familiar;

the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach." *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200 (1971)). There is no dispute as to the validity of the contract; both parties rely upon it to support their positions. The issue is whether NAMI sustained its burden to prove by a preponderance of the evidence that Walsh breached the contract and that NAMI suffered damages as a result.

## III.  Analysis

### A.  Partial Waiver and Release of Claims for Payment Form

The subcontract required NAMI to submit a Partial Waiver and Release of Claims for Payment form ("Partial Waiver and Release") along with each request for payment. (Ex. 501.) Specifically, the subcontract stated that, "as a prerequisite for payment, [NAMI] shall provide waivers and affidavits from [NAMI] in a form as shown in an Exhibit to this Agreement[.]" (Ex. 501 at 3.10.) The Partial Waiver and Release form was attached as Exhibit I to the subcontract and stated that NAMI waived and released Walsh from all suits and claims for payment for work performed "on the above-described Project from the beginning of time through the date indicated below, including extras." (Ex. 501 at 3.10, Ex. I.) Changes to or alterations of the contract were permitted only through a writing signed by both parties. (Ex. 501 at 12.5.)

Although encompassing the aspects of a traditional mechanics lien, the Partial Waiver and Release form was far more comprehensive, waiving any remedy for a claim of any sort. *Cf. Allgood Elec. Co. v. Martin K. Eby Const. Co.*, 85 F.3d 1547 (11th Cir. 1996) (concluding that a lien waiver waived only subcontractor's right to place a lien and not the right to pursue a claim for unpaid work through other means). Walsh asserts that NAMI waived all of its pending claims by submitting requests for payment using this Partial Waiver and Release form. (ECF No. 82 at 30-32.)

NAMI submitted its first four requests for payment using the Partial Waiver and Release form attached to the subcontract. (Ex. 541 at 1 (Aug. 26, 2010), 2 (Sept. 29, 2010), 3 (Nov. 3, 2010), 4 (Nov. 15, 2010).) However, in a request for payment dated January 3, 2011, NAMI added to the end of the form, in the same typeface used on the rest of the form, the phrase, "with the exception of all previously made claims in writing." (Ex. 541 at 5 (Jan. 3, 2011).) This language was included in at least six additional requests for payment. (Ex. 541 at 7 (March 21, 2011), 8 (March 25, 2011), 9 (April 26, 2011), 10 (May 25, 2011), 11 (June 10, 2011), 12 (Aug. 1, 2011).) Later, NAMI began adding a longer reservation statement that said, "…with the exception of all previously made claims in writing and retainage, such claims for extra work and impacts and retainage being specifically reserved by the Undersigned." (Ex. 541 at 13 (Sept. 9, 2011), 14 (Oct. 12, 2011), 15 (Nov. 17, 2011), 16 (Dec. 2, 2011), 17 (Jan. 19, 2012), 18 (March 6, 2012), 19 (March 19, 2012), 20 (April 25, 2012), 21 (May 10, 2012), 22 (June 21, 2012), 23 (July 10,

2012), 24 (July 30, 2012), 25 (Nov. 26, 2012), 26 (Dec. 4, 2012), 27 (April 8, 2013), 28 (April 18, 2013), 29 (May 28, 2013), 30 (July 5, 2013), 31 (July 30, 2013), 33 (Jan. 24, 2014), 35 (Jan. 24, 2014), 34 (Jan. 27, 2014).)  By virtue of the additional language explicitly reserving its claims, NAMI argues that it preserved the claims it now pursues.

Beginning as early as October 2010 and continuing throughout the Project, NAMI repeatedly notified Walsh in writing that "schedule changes," "added work," and "other impacts" were causing NAMI to expend additional time and costs in completing its work and that NAMI was reserving its right to seek "additional compensation" for its efforts. (*See* ECF No. 83, ¶ 55 (citing Exs. 509, 502, 114, 518, 213, 517, 29, 33, 36, 38, 41, 48, 51, 60, 90, 91).) Of particular note, NAMI submitted thirteen of the Partial Waiver and Release forms *after* NAMI filed this lawsuit seeking payment for these additional costs.

The October 2010 letter was merely a general complaint about conditions on the project and did not explicitly state an intention to pursue additional compensation. (Ex. 509.) However, starting with the December 1, 2010, letter (Ex. 502 at WALSH009825) it is certainly reasonable to argue that Walsh was aware that NAMI intended to seek compensation beyond that accounted for in its bid and that, by paying NAMI's claims despite these protests, Walsh agreed to exclude from the waiver the claims NAMI presents in this action. Thus, one could conclude that Walsh's payments to NAMI

9

constituted acceptance of NAMI's offer to change the terms of the subcontract and the

waiver form.

However, the court need not decide that question because Walsh's contention

that NAMI waived its claims by virtue of submitting the Partial Waiver and Release

form fails for an independent reason. Article 3.10 of the subcontract required the use of

a particular waiver form as a condition of payment. (Ex 501.) NAMI breached that

contractual provision when, unbeknownst to Walsh, it used a modified form. Walsh

argues that the consequence for NAMI's breach is to excise the reservation language

that NAMI added and enforce the waiver as originally written. But Walsh fails to point

to any authority that supports this conclusion.

*Lakeshore Commercial Finance Corp. v. Drobac*, 107 Wis. 2d 445, 319 N.W.2d 839

(1982), upon which Walsh relies, involved the question whether "a contract can be

effectively modified by less than all of the original signatories to the contract." The court

concluded that "the signatories entering into the modification can validly alter the

contract in respect to each other, but they cannot change the rights or obligations under

the contract of an original signatory who did not join in the modification." *Id.* at 447, 319

N.W.2d at 840. That is not the situation here.

*Lakeshore* does cite to *Morley-Murphy Company v. Van Vreede*, 223 Wis. 1, 6, 269

N.W. 664, 666 (1936), which states that, "when there is a material alteration in a contract,

the modified contract is a nullity in respect to 'non-consenting parties.'" But that does

not support the proposition that the court may excise the altered portion of an agreement and enforce the original contract. Indeed, *Morley-Murphy Co.* expressed that "the sounder and better rule, which is also the general rule, is to the effect that any material alteration of a written instrument made after its execution by a party claiming thereunder or with his privity, without the authority or consent of the other party or parties to the instrument, invalidates the instrument in the hands of the party responsible for the alteration, and his assigns, as to all nonconsenting parties." (citations and quotation marks omitted)). That is the same principle underlying the statement Walsh quotes from *Entzminger v. Ford Motor Co.*, 47 Wis. 2d 751, 177 N.W.2d 899 (1970): "a material breach by one party to a contract excuses subsequent performance by the other party." *Entzminger*, 47 Wis. 2d at 755 177 N.W.2d at 902.

Walsh fails to point to any authority supporting its position that the court may excise a unilateral alteration and hold all parties to the contract as if the alteration had never been made. Thus, applying the principles of the cases relied upon by Walsh to this case would appear to mean that NAMI's unilateral alteration of the waiver form rendered that form void in its entirety. In the absence of any authority supporting Walsh's position that the court may excise the inserted reservation language enforce the waiver as originally written, the court cannot conclude that ignoring the reservation clause and enforcing the waiver is the appropriate remedy for NAMI's breach of the contract.

11

### B. BIM claim

NAMI's bid included $107,000 for BIM modeling work on the Project. (Tr. 183.) It asserts that hundreds of problems were later uncovered through the BIM process and that it was forced to "make changes to duct and piping runs, including adding duct and pipe offsets, increase the size of supply air fans, and add condensate traps" to address these issues. (ECF No. 84 at 3-4.) This led NAMI to submit to Walsh four change order requests seeking a total of $708,520.35 in additional compensation. (ECF No. 83 at ¶ 94 (citing Exs. 164, 165, 166, 167).)

Although the parties refer to this category of claims as "BIM claims," that characterization is misleading. Rather than costs resulting from NAMI's BIM coordinator having to undertake additional computer modeling work, these claims are largely a result of NAMI having to do different work in the field than it initially anticipated. (*See* Exs. 164, 165, 166, 167; *see also* Tr. 886 (testimony of Walsh's healthcare virtual construction manager Steven Cook, quoting his comments in Ex. 126 ("I like how this gets the heading of 'BIM,' but the BIM hours only make up a small percentage of the total cost.").) Walsh's alternative reference to these claims as "changed work" claims (ECF Nos. 81 at 27; 82 at 23) seems more accurate, but the court shall refer to the claims as "BIM claims" because that is the term used throughout this litigation.

According to NAMI's president, Steve Ross, there were two causes of the BIM problems. (Tr. 64.) First, the Project architect failed to allot sufficient space in the

12

original drawings for all of the equipment it specified as fitting in those areas. (Tr. 61-62; *see also* Tr. 409-10 (testimony of NAMI project manager Ryan Radewan).) Remedying this problem was a matter of redesign, requiring "major modifications" that should have been the responsibility of the architect. (Tr. 62.) Second, Ross testified that problems resulted from other subcontractors not participating in the BIM process. (Tr. 63.) Thus, when NAMI went to install equipment in a particular space, it found the space already occupied by equipment installed by another subcontractor who had not participated in the BIM process and thus whose use of the space was not reflected in the BIM. (Tr. 63.)

In its proposed findings of fact, NAMI points to three examples of BIM problems that led to its claims (ECF No. 83, ¶ 77 (citing Exs. 522, 535, 123)). First, on November 6, 2010, when NAMI was placing its information into the BIM, it recognized that the BIM depicted walls being thinner than other information indicated they should have been. (Ex. 522.) Second, on December 6, 2010, NAMI personnel communicated to Walsh that they had to relocate duct and pipe systems to make everything fit. (Tr. 243 (discussing Ex. 535).) Finally, in July of 2011 NAMI personnel contacted Walsh regarding "conflicts with the ceiling elevations and roll up doors" and noted that the doors were not included in the BIM. (Ex. 123.)

Walsh contends that NAMI's BIM change order requests fall within the scope of Article 11.3 of the subcontract. Article 11.3 provides that, in the event of a dispute

relating to or arising from any act of the owner, Mercy, or its architect or involving the contract documents, NAMI is bound to Walsh to the same extent that Walsh is bound to Mercy. (Ex. 501 at 11.3) It goes on to say, "If [Walsh] cannot in good faith certify [NAMI's] Claim, [Walsh] shall not be required to submit [NAMI's] Claim [to Mercy], and in such case [NAMI] waives its right to seek compensation from [Walsh] or [Walsh's] surety(ies) for [NAMI's] Claim(s)." Finally, it provides that Walsh *may*, at its option, (i) present to the architect/engineer or owner, in Walsh's name, or (ii) authorize NAMI to present to the architect/engineer or owner, all of NAMI's claims, and to answer the claims of the architect/engineer or the owner involving NAMI or NAMI's work.

When NAMI submitted to Walsh the first of its four BIM change order requests, Walsh set up a meeting between NAMI, Walsh, and Mercy to discuss it. After consideration of NAMI's request, Mercy rejected it, stating that the original design drawings "are schematic in design and coordination is required per contract to make the systems work." (Ex. 536.) As for NAMI's next two BIM change order requests, Walsh contends it asked NAMI for information proving that the costs were "extra"— that is, beyond the costs included in NAMI's original bid. Claiming that it did not receive any additional information from NAMI establishing that the costs were indeed "new," Walsh did not arrange any additional meetings with Mercy to discuss the change orders. However, it did submit NAMI's second and third BIM change order

requests to Mercy, who rejected them as well. (Tr. 1114-15.) Walsh did not submit the fourth BIM change order request to Mercy. (Tr. 1206.)

NAMI argues initially that Article 11.3 does not apply because the BIM model that it used was not a "Contract Document" as that term is used in the subcontract because "it was merely Walsh's take-off of the Contract Documents to be used to coordinate the work." (ECF No. 84 at 7.) But at trial its employees conceded that the BIM problems arose from the acts and omissions of the Project architect. (Tr. 60-65, 409-10.) NAMI has not established that the BIM dispute falls outside of the scope of Article 11.3.

NAMI's principal argument is that Walsh did not do enough to pursue the BIM change order requests for payment from Mercy. Specifically, it argues that Article 11.3 requires Walsh to either pursue the claims against the owner or allow NAMI to do so in Walsh's name. (ECF No. 84 at 4.) It argues that Walsh instead elected to "do nothing," which NAMI contends was a breach of Walsh's implied duty of good faith and fair dealing under the subcontract. (ECF No. 84 at 5.)

But Walsh did not "do nothing." As to the first of the BIM change order requests, Walsh set up a meeting among it, NAMI, and Mercy. At the meeting, NAMI presented to Mercy information that it argued justified additional compensation beyond what it had bid. Mercy disagreed and rejected the claim. NAMI did not present evidence that Walsh somehow caused Mercy to reject the claim or that Walsh had the power to

persuade Mercy to pay the claim and simply chose not to exercise it. It is not clear what NAMI contends Walsh should have done beyond what it did with regard to the first of NAMI's BIM change order requests.

Walsh also submitted the second and third of NAMI's four BIM change order requests to Mercy, who rejected them as well. NAMI implies that Walsh was not aggressive enough in its efforts to seek payment for NAMI on these BIM change order requests—that it should have done something more. But nothing in Article 11.3 required Walsh to do more—for example, to sue Mercy. Nor did anything in Article 11.3 require Walsh to authorize NAMI to sue Mercy. Article 11.3 states only that Walsh "may" prosecute the claim further on NAMI's behalf or authorize NAMI to prosecute the claim directly against Mercy, but it did not require Walsh to do either. And according to Walsh, because it "had questions as to whether NAMI was being asked to do any more than what the contract actually called for in BIM coordination[,]" it questioned whether it had a "good faith reason to believe the claims were viable …." (ECF No. 82 at 27.) Notwithstanding those concerns, it passed three of the four change order requests on to the one party that had the authority to decide whether to accept them or not: Mercy. Mercy having rejected the three BIM change order requests presented to it, NAMI fails to demonstrate that the fourth BIM change order request would have met a different fate.

Further, NAMI's BIM claim assumes that it would have prevailed on its BIM change order requests had Walsh "done something more," such as sue Mercy or authorize NAMI to sue Mercy. If NAMI had ultimately lost on its BIM claim against Mercy, no basis would exist for forcing Walsh to pay NAMI on the claim. To prevail on its BIM claim, NAMI has to prove that the additional costs it estimated in the four BIM change order requests were really the result of a change, i.e., "an alteration to an existing contract requirement concerning work that is already required to be done." 1 Bruner & O'Connor Construction Law § 4:1 (quoting Goldberg and Banks, Changes and Extras, in 1 Constr. Law. Handbook § 21.01 (1999)). Put differently, NAMI must prove that its four BIM change order requests are seeking payment for work that was not included in its original bid.

Toward that end, NAMI points to the testimony of Steven Cook, Walsh's healthcare virtual construction manager, who noted that in one of the remodeling portions of the project Walsh unexpectedly encountered "electrical conduit that needed to remain in place likely to support the electrical needs for the rest of the facility to remain open." (Tr. 887.) The court might presume that this resulted in some alterations to NAMI's installation plans, although NAMI has not directed the court to any specific evidence supporting such a conclusion. But, more importantly, NAMI did not prove the extent and cost of any such change. It presented a single comprehensive claim for this section of the project seeking a total of $256,819.38. (Ex. 167.) But it did not present

evidence that would enable the court to conclude that that entire sum is attributable to the unexpected discovery of electrical conduit.

Cook separately acknowledged that NAMI "performed additional changes that were different than what was in the [contract] drawings." (Tr. 896.) However, the court did not understand him to be conceding that NAMI's entire BIM claim was valid. To the extent Cook's testimony can be interpreted as a concession that some money is due NAMI for its BIM claim, the court has no way of determining how much is owed.

Finally, as Walsh points out, NAMI conceded at trial that the four change orders that make up its BIM claim were merely estimates of the labor hours that would be required to perform the work covered by each change order. (Tr. 421-35.) None of them identifies the actual labor hours required to perform the work. Without that information, NAMI has not provided the court with a basis for compelling Walsh to pay it a specific sum for so-called additional BIM costs. This failure to prove its damages precludes NAMI from relief even if the court were to accept NAMI's position that its BIM claim is outside the scope of Article 11.3.

### C. Labor Inefficiencies Claim

NAMI's biggest claim, for which it seeks $1,747,326, is one that it characterizes as for "labor inefficiencies." It alleges that Walsh materially changed the conditions under which NAMI was to perform its work, which resulted in NAMI having to spend thousands of additional man-hours to complete the work due to Walsh's

18

mismanagement of the Project. Among other things, NAMI contends that Walsh did not follow the planned schedule that stated that NAMI's overhead duct and plumbing work would start weeks before the installation of metal studs and drywall. It also contends that it was forced to work around other trades and materials that were not supposed to be in the areas that NAMI was working in. And because exterior walls and roofs were not installed "in time," it was forced to work in wet conditions and cold weather that impacted how long its work took.

Walsh contends that NAMI's claim is barred by Article 4.4 of the subcontract, which limits NAMI's remedy for delays to an extension of time to perform its work, and Article 5.1, pursuant to which—as long as Walsh acted in good faith—NAMI waived any claim it might have as a result of delay, disruption, interference, obstruction, hindrance and out-of-sequence work. It argues that what NAMI calls "inefficiency" is clearly delay within the meaning of these provisions of the subcontract. And it disputes that any of the delays were caused by Walsh's alleged "mismanagement" but rather were caused by unforeseen site conditions, record amounts of snow, and Mercy's changing directives as to what spaces could and could not be occupied.

Further, Walsh argues that its contract with Mercy required Walsh to initiate any claims for additional compensation within 21 days of the occurrence of the event giving rise to such claim. (ECF No. 82 at 5; Ex. 519, § 15.1.2.) In turn, the subcontract between Walsh and NAMI required that NAMI make any claims it had for additional

compensation within seven days of the occurrence of the event giving rise to such claim. (ECF No. 82 at 5; Ex. 501 at Art. 4.3.) In many instances, NAMI *did* submit such claims to Walsh, resulting in NAMI receiving over $1 million in change orders and contract enlargements. (*See* Ex. 541 at tab 35 (noting that the contract price with changes and extras was now nearly $5 million).) But with regard to its inefficiency claim, NAMI simply served Walsh with letters alleging that "schedule changes," "added work," and "other impacts" were causing NAMI to expend additional time and costs in completing its work and that NAMI was reserving its right to seek "additional compensation" for its efforts at some unidentified point in the future. Walsh says the subcontract did not give it that right.

NAMI disputes that its claim falls under the "no damages for delay" language of the subcontract, arguing that Article 4.4 limits only claims arising from a delay in performance and not claims arising from a disruption in NAMI's performance due to Walsh's failure to perform its construction management duties.

Regardless of what term is used to refer to NAMI's claim, be it delay or inefficiency, it falls within the scope of the "delay, hindrance, interference or other similar event" language used in Article 4.4. NAMI may avoid the consequences of Article 4.4 and its explicit waiver of any additional compensation due to delay only if it can show that the delays or inefficiencies were caused by Walsh's intentional wrongdoing or gross negligence. *See John E. Gregory & Son, Inc. v. A. Guenther & Sons*

*Co.*, 147 Wis. 2d 298, 304, 432 N.W.2d 584, 586 (1988). Under Wisconsin law, there are three instances when a claim is not barred by a "no damages for delay" clause: delays caused (1) by fraudulent conduct, (2) by reason of orders made in bad faith, and (3) by reason of orders unnecessary in themselves and detrimental to the contractor and which were the result of inexcusable ignorance or incompetence. *Id.* at 304, 432 N.W.2d at 586 (citing *First Sav. & Trust Co. v. Milwaukee Cnty.*, 158 Wis. 207, 240, 148 N.W. 1093, 1093 (1914). NAMI contends that Walsh's failure to mitigate the problems NAMI was experiencing on the Project, including by failing to allocate adequate staff to supervise the Project, rose to the level of inexcusable ignorance or incompetence. (ECF No. 84 at 13-14.)

Although there is evidence that Walsh arguably mismanaged the Project, its conduct did not rise to the level of fraud, bad faith, or inexcusable ignorance or incompetence. As for the manner in which Walsh staffed the Project, NAMI additionally failed to show how an increase in staffing would have avoided any of the problems NAMI encountered. Thus, Article 4.4 forecloses NAMI's inefficiency claim.

Moreover, the letters NAMI sent to Walsh purporting to reserve its right to later pursue a claim for "added costs" do not comply with Article 4.3. The purpose of Article 4.3 is to give Walsh the opportunity to pass on to Mercy the responsibility for paying any "added costs" those subcontractors believe they incurred and for which they claim they are entitled to compensation. Because Walsh had a very limited window under its

Case 2:12-cv-00598-WED   Filed 09/18/15   Page 21 of 39   Document 87

contract with Mercy for submitting such claims (21 days), its subcontracts, including its subcontract with NAMI, required that each subcontractor submit any such claim within seven days of becoming aware of a claim to which it claimed to be entitled to additional compensation. Walsh loses its right to pass the costs of the claim on to Mercy if the claim is not timely received from the subcontractor. NAMI's letters stating generally that it was incurring additional costs for which it believed it was entitled to additional compensation gave Walsh no basis upon which to seek from Mercy, within the contractual period, additional compensation to cover such costs.

Those conclusions obviate the necessity to address NAMI's claim for damages associated with its inefficiency claim. However, NAMI's failure to adequately prove its damages with respect to this claim presents an independent reason why this claim fails.

NAMI bases its damages with respect to this claim upon the opinion of John Spittler, a professional engineer who testified as an expert on behalf of NAMI. Spittler authored a report containing four opinions, only two of which are at issue here. In Opinion One, he opined that the bid that NAMI submitted to Walsh was based on a reasonable estimate of the labor hours (32,877) required to perform the work. (Ex. 135 at 15, 21.) He set forth three bases for that opinion. First, he reviewed NAMI's methodology for preparing the bid and concluded it was reasonable. (Ex. 135 at 15.) Second, he reviewed six bids, provided by NAMI, for other allegedly comparable HVAC projects that NAMI worked on. (Ex. 135 at 15.) On those projects NAMI's actual

labor hours ranged from between 90 to 116 percent of the labor hours contained in its bid. (Ex. 135 at 15.) Finally, he was told by NAMI that Walsh received other bids for the HVAC work on the Project that were within $30,000 of NAMI's bid. (Ex. 135 at 15.)

In Opinion Three, Spittler opined that to complete its work on the Project NAMI had to spend 24,404 labor hours more than those set forth in its bid and in approved and outstanding change orders. (Ex. 135 at 18-22.) He said these excess hours were "primarily" caused by Walsh's changes to the scope of the work and site conditions and management of the Project. (Ex. 135 at 18-22.) Specifically, Spittler said, "It is my opinion that Walsh's reactive approach to managing the Project, including abandoning CPM schedules, and failing to coordinate subcontractors and their activities, caused the majority of NAMI [sic] labor hour overrun." (Ex. 135 at 22.) Multiplying the 24,404 of additional labor hours by a $71.60 hourly labor rate that NAMI sent to Walsh for the Project, Spittler opined that the additional labor hours resulted in an additional cost to NAMI of $1,747,326. (Ex. 135 at 24.)

Walsh initially sought to strike Spittler's opinion at summary judgment as insufficient under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). The court noted concerns about Spittler's opinions but concluded, in part because the court rather than a jury would resolve this matter, that the best route was to permit him to testify and then "give his testimony whatever weight the court deems appropriate." (ECF No. 54 at 17.)

### i. Total Cost Method

The approach Spittler used to calculate NAMI's damages, called a total cost method, looks to the difference between the amount bid for the work and the actual cost of the work. *See Raytheon Co. v. White*, 305 F.3d 1354, 1365 (Fed. Cir. 2002). The problem with such an approach is it could reward a contractor that was unrealistic in its bid or inefficient in its performance. *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861-62 (Fed. Cir. 1991). For that reason, the total cost method of proving damages is a methodology of last resort, appropriate only when there is no better way to calculate damages. *Id.* "Before a contractor can obtain the benefit of the total cost method, it must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for the added costs." *Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1339 (Fed. Cir. 2003). At trial, NAMI's Steve Ross testified that it was not practical for NAMI to calculate in "real time" (meaning, as the Project was progressing) the actual additional costs that NAMI was incurring by virtue of Walsh's inefficient management of the Project. (Tr. 84-85.)

In concluding that NAMI's bid was reasonable, Spittler did not adequately explain how he reached the conclusion that NAMI's bid methodology was reasonable. Nor did he take any steps to ensure that the so-called comparable projects NAMI provided to him were, in fact, comparable, including whether they were new construction or renovations or whether they were representative of NAMI's general

experience over the period encompassed by those projects. However, Walsh's own senior superintendent testified that NAMI's bid was reasonable (Tr. 1042-44), and thus the court can look past the shortcomings in this aspect of Spittler's opinions.

The bigger problem with Spittler's opinion and the resulting damage calculation was his failure to establish NAMI's lack of responsibility for any of the additional costs. Spittler explicitly stated that NAMI's "labor hour overruns in excess of 24,000 labor hours...[were] *primarily* caused by changes to the scope of the work and site conditions, management and Project circumstances that differed materially from the subcontract." (ECF No. 135 at 17 (emphasis added); *see also* Ex. 135 at 21 ("It is my opinion that Walsh's reactive approach to managing the Project, including abandoning CPM schedules, and failing to coordinate subcontractors and their activities, caused the *majority* of NAMI labor hour overrun.") (emphasis added).) Nonetheless, he then proceeded to allot *all* of the additional costs to Walsh. (*Cf.* Ex. 310 at 16-17 (discussing Spittler's failure to account for delays not attributable to Walsh).) The court is provided with no means by which to subtract whatever costs were *not* attributable to Walsh (nor even a means of identifying which costs those might be). Thus, applying the total cost methodology would, by Spittler's own admission, reward NAMI for its own inefficiencies.

Further, although Spittler did exclude certain additional costs, such as those for change orders (*see* Tr. 647-48), his efforts were incomplete. For example, he did not

distinguish between fieldwork and shop work, only the former of which would have been impacted by Walsh's alleged site inefficiencies. (Tr. 650.) Nor did he exclude work occurring before at least November 15, 2010, which the court must exclude because NAMI waived any claims for that work when it submitted waiver forms without any reservation language. (*See* Ex. 541 at 4.)

In failing to fully analyze NAMI's responsibility for the added costs, the court cannot conclude that Spittler's use of the total cost method was an appropriate means for calculating NAMI's damages. *See Propellex Corp.*, 342 F.3d at 1343.

Spittler offered two alternative methods for calculating NAMI's inefficiency damages. It appears that his purpose in doing so was to bolster his conclusion under the total cost method by demonstrating that they resulted in damage calculations that were in the same general ballpark as the amount arrived at using the total cost method. It does not appear that he intended that these calculations would form an alternative basis for an award of damages to NAMI if the court rejected his total cost method of calculating damages. (*See* Tr. 666, 694-96.) But because the court finds that Spittler's total cost method was insufficient, it will determine whether either of the alternative approaches could sustain an award of damages to NAMI.

### ii. Measured Mile

Spittler's second means of calculating NAMI's damages, a so-called measured mile calculation, yielded an additional hour figure (22,356) somewhat similar (within

roughly 9 percent) to that which resulted from application of the total cost method. (Ex. 135 at 21-22.) A measured mile analysis requires quantifying the time it took NAMI to complete work in areas that were "impacted" by conditions that caused it to be inefficient and compare that with the time it took NAMI to complete essentially identical work in areas that were "unimpacted" by such conditions. (Tr. 654-55.) Spittler acknowledged that he lacked sufficient data to permit him to render a professional opinion that would allow his measured mile analysis to stand on its own. (Tr. 696.)

NAMI used three sets of comparisons of the time it took it to perform work in areas unimpacted by inefficiencies with the time it took it to perform similar work in areas that were impacted by inefficiencies. All three comparisons were in areas of the Project that were new construction. (Tr. 708.) It made no similar comparison of the amount of time it took to complete work in areas that were being remodeled. First, in a "clear" area it took NAMI three man-hours to install 25 feet of duct; when NAMI had to install it through walls that had been drywalled, it took six hours. (Ex. 136.) Second, NAMI installed 80 feet of pipe, which took 5 hours in clear conditions but 8 hours when NAMI installed it through walls that had been drywalled. (Ex. 136.) Third, the installation of 40 feet of 10 inch storm drain, 30 feet of 8 inch storm drain, and 30 feet of 4 inch storm drain required 22 hours, compared with the installation of 70 feet of four inch storm drain through walls that had been drywalled, which required 32 man hours. (Ex. 136.) Using these comparisons, Spittler calculated an average inefficiency rate of 68

percent, which he then applied to the whole project to yield an additional 22,356 of labor hours needed to complete the Project because of the inefficiency.

One problem that immediately jumps out is the exceedingly small sample size that Spittler used for comparison purposes. He used only 30 "unimpacted" hours on a project on which NAMI bid over 32,000 labor hours to complete. (Ex. 135 at 21.) That represents less than a tenth of one percent (0.09375%) of the total project hours. From that small number of unimpacted hours, he extrapolated an inefficiency percentage that he applied to the total number of Project hours. Use of a small sample size can detract from the value of statistical evidence. *Cf. Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 340 fn. 20 (1977); *Farmer v. DirectSat USA, LLC*, 2013 U.S. Dist. LEXIS 39912, 18-19 (N.D. Ill. Mar. 22, 2013).

In addition, Spittler's average inefficiency rate would be appropriate only if all of the hours spent working on the Project consisted of one of the three different types of work that he used in his comparison—installing ductwork through walls, installing pipe through walls, and installing drainpipe through walls. And each of those tasks would have to represent the same percentage of the total Project as they did of the sample size—because each made up a different percentage of the overall inefficiency percentage. No evidence was introduced to support such a conclusion.

Spittler also did little to evaluate whether the samples offered by NAMI were, in fact, appropriate for comparison; the examples in the third set plainly was not

comparable in that the unimpacted portion involved substantially more pipe than that involved in the impacted portion, yet Spittler treated these as equivalent. Nor did he attempt to control for other variables, such as ensuring that the work was performed by similarly-skilled crews under similar conditions. Overall, Spittler merely discussed the rudiments of a measured mile analysis with NAMI and left it up to NAMI to perform the test. He then accepted NAMI's data. His contribution to the measured mile calculation was largely arithmetic; the actual underlying data, which is generally the province of the expert, was NAMI's. Thus, the court finds that Spittler was correct when he conceded that his measured mile analysis could not stand on its own.

### iii.  MCAA Factors

Spittler also looked to a bulletin published in 1976 by the Mechanical Contractors Association of America (MCAA) that stated that various factors on a construction project might affect a contractor's productivity. For example, stacking of trades might result in a 10 to 30 percent loss of productivity; crew size inefficiency also might result in a 10 to 30 percent loss of productivity; and joint occupancy (causing work to be performed while the facility is occupied by other trades not anticipated in the original bid) might result in a 5 to 20 percent loss of productivity. (Ex. 135 at 22.) From this list of possible causes of a loss of productivity Spittler identified those that he believed affected NAMI on the Project, took the low-end percentage figure for each factor, and added them together to conclude that NAMI was 70 percent inefficient. (Ex. 135 at 22-

Case 2:12-cv-00598-WED   Filed 09/18/15   Page 29 of 39   Document 87

23.) Multiplying that 70 percent inefficiency figure by the total hours bid on the Project (32,877) yielded 23,014 of additional labor hours needed to complete the Project, a figure within roughly 6 percent of the 24,404 of additional labor hours calculated using the total cost method. (Ex. 135 at 23.)

One of the MCAA factors that Spittler said affected NAMI's efficiency on the Project was the "beneficial occupancy" factor, which relates to the difficulties resulting from the fact that Mercy was still operating during construction. (Ex. 135 at 22.) That factor would appear to have a greater (if not exclusive) impact on the remodeling portions of the Project than it would to areas that were new construction, and yet he applied it to the entire Project. And Spittler does not explain why any inefficiency resulting from this factor is attributable to Walsh. Perhaps most importantly, NAMI was well aware when it bid on the Project that it would have to work around Mercy, which was going to remain open during construction, and it presumably factored that into its bid.

Moreover, the MCAA bulletin states:

These factors are intended to serve as a reference only. Individual cases could prove these to be too high or too low. The factors should be tested by your own use of them, since percentages of increased costs due to the factors listed are necessarily arbitrary and may vary from contractor to contractor, crew to crew and job to job.

(Ex. 321; *see also* Tr. 710, 1279); *Sunshine Constr. & Eng'g, Inc. v. United States*, 64 Fed. Cl. 346, 371 (Fed. Cl. 2005) (quoting MCAA Bulletin No. 58). Yet Spittler made no apparent

Case 2:12-cv-00598-WED   Filed 09/18/15   Page 30 of 39   Document 87

effort to test these factors against NAMI's own work experience or to modify them accordingly. In fact, Spittler testified that he did not "hone in on" the MCAA analysis but instead felt he "did enough" so he "felt comfortable … that there was something there." (Tr. 697-98.) Spittler failed to take the next crucial step of analyzing the specific conditions of the Project to assess the extent and impact of any condition to arrive at an appropriate inefficiency rate.

In sum, none of the three approaches used by Spittler provide the court with enough information to reliably award any specific amount of damages to NAMI as a result of the alleged inefficiency caused by Walsh on the Project.

### D.  General Conditions Claim

NAMI's bid included $185,000 for "General Conditions," described by NAMI project manager Ryan Radewan to "include all the miscellaneous items…use[d] on site that aren't … like a sheet metal or a pipe material." (Tr. 468.) General conditions could include everything ranging from NAMI's on-site trailer to crane time (Tr. 468) as well as lift rentals and general office expenditures (Tr. 474). The general conditions bid amount is a percentage of the total bid rather than a calculation of specific items. (Tr. 468.) As the project progressed, NAMI submitted pay applications to Walsh indicating the general conditions costs incurred during the relevant period. (Tr. 468-69.)

Spittler opined that "[b]ecause of changes, management, delays and extended performance by Walsh, NAMI was on the Project 479 calendar [days] longer than

contemplated in its bid. Therefore, NAMI incurred, and is entitled to, additional General Conditions cost of $201,397.73 for its extended time on the Project." (Ex. 135 at 24.) He arrived at that figure by taking the $185,000.00 general conditions amount in NAMI's bid and dividing it by the number of days (440) the Project was initially expected to last, arriving at a daily general conditions cost of $420.45. He then multiplied that daily cost by the number of additional days (479) required to complete the Project to arrive at a total additional general conditions cost of $201,397.73. (Ex. 135 at 25.)

Walsh argues that this approach ignores NAMI's actual additional general conditions costs, information that Walsh contends was available. (ECF No. 82 at 29.) NAMI's Radewan testified that he quantified general conditions costs based upon actual expenditures on an ongoing basis during the project (Tr. 469, 473-74). He also testified that general conditions costs tend to be higher at the beginning of a project. (Tr. 472-73.) In fact, NAMI billed $113,000 of its $185,000 general conditions costs (over 60 percent) to the Project before the end of 2010. (Tr. 472.) Spittler and Radewan both concede that the approach used by Spittler does not calculate what, if any, additional general conditions costs NAMI actually incurred by virtue of the fact that the Project took longer than anticipated. (Tr. 473, 734.)

An unexpected extension of the length of a project very well might result in additional general conditions costs for a subcontractor. For example, equipment might

have to be rented for a longer period than anticipated. But the court is provided with no evidence of the actual additional general conditions costs, if any, that NAMI actually incurred as a result of this Project taking longer than initially expected. Although Spittler testified that he could have calculated NAMI's actual general conditions costs, he chose the per diem methodology because "[i]t's just easier." (Tr. 669-70.) Expediency may be a sufficient justification for shortcuts in the everyday affairs of business. But in court a plaintiff has the burden of proving its damages with reasonable certainty. *Designer Direct, Inc. v. Deforest Redevelopment Auth.*, 368 F.3d 751, 752 (7th Cir. 2004) (citing *Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 387, 254 N.W.2d 463 (1977)). And NAMI has not proven what, if any, additional general conditions costs it incurred by virtue of the Project taking longer than expected. Additionally, the general conditions claim is a claim for damages resulting from delay and, as such, is barred by Article 4.4 of the subcontract.

### E. Miscellaneous Change Orders

NAMI also seeks $43,889.32 for 12 change orders covering work it allegedly performed at Walsh's direction but for which Walsh did not pay NAMI. (ECF No. 84 at 22-23.) Walsh opposes these requests. It contends that it previously rejected some claims because they were unsupported with appropriate proof and it paid others. (ECF No. 86 at 13-15.) Walsh also argues that NAMI failed to demonstrate that these claims were

timely submitted under Article 4.3 of the subcontract. (ECF No. 86 at 13-15.) The court will address each of the change orders.

Exhibit 150 is an invoice dated November 10, 2011, for $9,187.33 for Walsh's use of NAMI's all-terrain lift and Bobcat. NAMI's Radewan testified, "Aaron Bossow with Walsh would use our equipment all the time. So I felt it was – you know, I felt that we should be able to at least recover our costs for the use of the equipment." (Tr. 357-58.) But he admitted that he had no information that the invoice was timely under Article 4.3, nor could he point to anything that indicated that NAMI was contractually entitled to recover these costs from Walsh. As a result, NAMI failed to prove that it is entitled to recover on this claim.

Exhibit 153 is an invoice for $3,383.01 for the relocation of valves. On it is a notation that states, "Paid $2,999 as part of CO 27." NAMI now seeks payment for the rest of the invoice, $384.00 (ECF No. 83 at ¶ 147) (apparently content to forgo the additional penny). Change Order 27 states, "The price adjustments (if any)…granted under this Change Order constitute payment in full for the work covered by the Change Order…." NAMI signed and accepted payment for Change Order 27, and may not now be heard to claim that it is entitled to recover any additional sum for this alleged change.

NAMI's claim regarding the change set forth in Exhibit 155 fails for the same reason. It was also included in Change Order 27.

Similarly, NAMI alleges the payment it received for Change Order 43 (Ex. 540 at tab 43) was short. (*See* Tr. 374; Ex. 188.) However, the "Contract Change Order" signed by NAMI's construction director Melody Doyle explicitly states that the amount reflected constitutes full and final payment for the work covered by it. (Ex. 540 at tab 43, pgs. 1-2.) As such, NAMI may not recover any additional amount.

NAMI also failed to prove that Walsh authorized the changes covered by Exhibit 156. On Exhibit 156, the signature line below the "acceptance" portion of the proposal is blank. There is no indication that Walsh ever approved this change proposal. Therefore, NAMI cannot recover on this claim.

However, seven exhibits relate to claims that indicate they were approved by Walsh and for which Walsh has not presented evidence indicating that NAMI was paid. Walsh does not specifically address these claims. The fact that Walsh approved the changes suggests the claims were timely under Article 4.3. Therefore, in the absence of any defense from Walsh, the court finds that NAMI has proven that it is entitled to compensation as follows:

| Exhibit | Date of Claim (as indicated on Ex. 188) | Description of Claim | Amount | Interest |
|---|---|---|---|---|
| 157 | September 24, 2012 | Area 4 Insulation Repair | $722.81 | $107.83 |
| 158 | April 25, 2013 | Existing Grille Replacement | $442.39 | $75.21 |
| 159 | August 29, 2012 | Area 8 Grille Install | $1,525.08 | $232.94 |
| 160 | August 29, 2012 | Area 8 Radiant Ceiling Panel Install | $680.79 | $103.98 |
| 161 | September 20, 2012 | Area 4 Supply Grilles | $655.76 | $98.18 |
| 162 | September 20, 2012 | Removal and re-install of RCP's in A | $2,530.47 | $378.88 |
| 163 | August 9, 2012 | Area 3 Grille Install | $763.34 | $118.68 |
| | | **TOTAL:** | **$7,320.64** | **$1,115.70** |

### F. Interest

In a breach of contract dispute, Wisconsin has long recognized that "prejudgment interest should be awarded where the amount owed is readily determinable." *United States Fire Ins. Co. v. Good Humor Corp.*, 173 Wis. 2d 804, 833, 496 N.W.2d 730, 741 (1993); *see also Laycock v. Parker*, 103 Wis. 161, 178-89, 79 N.W. 327, 332-36 (1899); *Waukesha Concrete Products Co. v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 340, 379 N.W.2d 333, 336 (Ct. App. 1985). "The equitable policy supporting such recovery is that a plaintiff should be compensated for the time value of the money he would have had if the payment had been made when due." *Chi. Title Ins. Co. v. Runkel Abstract & Title Co.*, 654 F. Supp. 2d 926, 928 (W.D. Wis. 2009). A prevailing plaintiff is not barred from recovering interest merely because there was a genuine dispute as to whether the money was owed; interest is recoverable unless there was a genuine dispute about the

*amount* owed. *Good Humor Corp.*, 173 Wis. 2d at 833, 496 N.W.2d at 741. Interest begins

to accrue from the time of demand. *Waukesha Concrete Products Co.*, 127 Wis. 2d at 340,

379 N.W.2d at 336.

Shortly before trial, Walsh paid NAMI its "subcontract balance" (ECF No. 84 at 2)

of $306,000.00 (Tr. 19). Although that portion of its claim is no longer at issue (Tr. 19),

NAMI's post-trial brief dropped a footnote stating that it "maintains that it is entitled to

payment of interest accrued from the due date of the principle subcontract balance, as

detailed on pages 3-5 of the Cost Tracker, Exhibit 188." (ECF No. 84 at 2 fn.1.) Beyond

the fact that a footnote is not an appropriate way to raise or preserve a claim, *see Long v.*

*Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) (citing *Beamon v. Marshall &*

*Ilsley Trust Co.*, 411 F.3d 854, 862 (7th Cir. 2005); *United States v. White*, 879 F.2d 1509,

1513 (7th Cir. 1989)), NAMI has not explained the precise nature of this claim so that the

court could determine whether an award of interest is appropriate. Nor has NAMI

identified a date when the claim accrued to enable the court to calculate interest.

Without this information, the court is unable to determine what amount of interest, if

any, is due on this sum.

However, prejudgment interest is appropriate with respect the miscellaneous

change orders discussed above. Contrary to Walsh's only argument in opposition to

NAMI's claim for prejudgment interest (ECF No. 86 at 15), these sums were readily

determinable (and, in fact, not disputed by Walsh). They are detailed on page six of

Exhibit 188. (Tr. 397-98.) Exhibit 188 contains at lines 184, 185, 186, 187, 188, 189, and 190 calculations related to the claims set forth in Exhibits 157, 158, 159, 160, 161, 162, and 163, respectively, discussed above. Walsh does not argue that the "Date Sent to Walsh" indicated in column E of the spreadsheet is inaccurate, and the court finds that each is consistent with the dates contained on each exhibit.

The spreadsheet, however, contains an apparent discrepancy. Column N is headed "Number of days o [sic];" the remainder is cut off. (Ex. 188 at 3.) Column O is headed "Months over due [sic]." (Ex. 188 at 3.) Given that the numbers in column N divided by 30 yields the figures contained in column O, the court presumes that column N is intended to reflect the number of days the payment is overdue. The spreadsheet was calculated through May 1, 2015. However, subtracting the number of days in the days overdue column (column N) from May 1, 2015 does not yield the "Date Sent to Walsh" set forth in column E. In the absence of any contrary evidence, the court shall use the date of the demand, reflected in column E of Exhibit 188 and set forth in the table above, as the date the interest began to accrue.

As for the proper interest rate to be applied, Radewan testified that he applied an 18 percent annual interest rate when he prepared the spreadsheet. (Tr. 397-96.) When asked why he chose that rate, Radewan testified he was unsure, but speculated that he may have looked to the state statute. (Tr. 398.) NAMI does not point to any provision in the subcontract providing an interest rate for past-due balances. Thus, the appropriate

38

interest rate is Wisconsin's statutory interest rate of 5 percent. *Good Humor Corp.*, 173 Wis. 2d at 833, 496 N.W.2d at 740-41; Wis. Stat. § 138.04. This yields, as set forth above, total prejudgment interest due, as of the date of this decision, of **$1,115.70.**

## IV. Conclusion

For the reasons set forth above, the court finds that it must generally reject NAMI's claims and find in favor of Walsh. However, the court finds that NAMI proved that it is entitled to **$7,320.64** for approved changes for which Walsh has not demonstrated a defense. Because these sums were readily determinable, NAMI is entitled to interest on these sums at the statutory annual rate of 5% accruing from the date NAMI submitted the claim to Walsh for a total of **$1,115.70.** NAMI failed to demonstrate that it is entitled to interest on any other sum.

**IT IS THEREFORE ORDERED** that the Clerk shall enter judgment in favor of North American Mechanical, Inc. and against Walsh Construction Company II, LLC, in the amount of **$7,320.64**, together with pre-judgment interest in the amount of **$1,115.70.**

Dated at Milwaukee, Wisconsin this 18th day of September, 2015.

WILLIAM E. DUFFIN
U.S. Magistrate Judge